UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WILLIAM V. LANGFITT III, et al.,

                    Plaintiffs,

        v.

PIERCE COUNTY, et al.,

                    Defendants.

CASE NO. C21-5122 BHS

ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

        THIS MATTER is before the Court on Defendants Pierce County and Deputy

Colby Edwards' Motion for Summary Judgment, Dkt. 59. The Court has described the

factual and procedural context of the case in its prior Orders resolving Defendants' prior

dispositive motions (for judgment on the pleadings, Dkt. 16, and to dismiss, Dkt. 37). *See*

Dkts. 35, 54. Defendants now argue there is no evidence supporting Langfitt's remaining

§ 1983 excessive force claim against Edwards or his *Monell* "failure to train" claim

against the County. They argue that even if Edwards violated Langfitt's constitutional

rights, he is entitled to qualified immunity as a matter of law.

        The issues are addressed in turn.

# I.   BACKGROUND.

The facts of the case are largely documented and, with exceptions discussed below, largely undisputed.[1] On the night of March 16, 2018, Naomi Powers called 911 to report that her boyfriend, William "Billy" Langfitt[2] was having some sort of mental crisis or emotional break. They had left Langfitt's house in Powers' white Subaru Outback because his roommate had children in the home, and Powers was concerned about their safety. Powers called 911 from her car while stopped with her "flashers" on, just off Mountain Highway 7 at 252nd Street East, in rural Pierce County. The transcript of Powers' 911 call is part of the record. Dkt. 63, Ex. A.

---

[1] The evidence documenting the incident is described in and attached to Defendants' submissions at Dkts. 60, 61, 63, 65, 66, 67, 68, 69, 70, 71, 72, 79, and 80. Defendants' exhibits each have letter designations, but the exhibits do not appear in the record sequentially, making it cumbersome and counterintuitive to locate referenced documents in the record. This problem is exacerbated by the fact the exhibits are not individually filed or identified in the corresponding CM/ECF filings.

Langfitt submits the Declaration of Naomi Powers, Dkt. 75, and exhibits to the Valdez Declaration, Dkt. 76. Each party has also submitted "thumb drives" that appear to be video from the dashboard camera of a bystander, Kyle Black, "synced" with the audio of the 911 calls. *See* Dkts. 62, 77. Black's Declaration is Dkt. 70.

The Court has read all the materials and reviewed the videos. While the audio is useful, the videos in the record were taken from too far away to show any details of the incident, and the Court's Order does not rely on them. The videos themselves do not show what the parties seem to contend they show. Nevertheless, there is ample evidence in the record from which the Court can determine the constitutionality of Edwards' actions.

Additionally, the parties have submitted expert opinions, at Dkts. 73, 76-15. Neither is factored into the Court's analysis. Defendants' Motion to Strike Langfitt's expert's opinion, Dkt. 78 at 2–4, is DENIED. Defendants' Motion to Strike Powers' Declaration, Dkt. 78 at 4–5, is also DENIED.

[2] The primary plaintiff is the personal representative of William V. Langfitt IV's estate. This Order uses "Langfitt" for clarity and ease of reference.

1    Powers explained that Langfitt was having a "bout of paranoia," and, after

2  grabbing her wheel and honking the horn, had climbed out of her car. She reported that

3  he had earlier had a pocketknife, but that Powers now had possession of that knife.

4  Powers reported that Langfitt was screaming at passing cars on Mountain Highway,

5  banging on them, and trying to enter them. Edwards received this report over his radio.

6  Dkt. 67 at 11. Powers remained on the line with the 911 dispatcher during the entire

7  incident. Powers reported that Langfitt was "literally flipping out," and his actions led

8  others in the area to also call 911. Powers can be heard on the 911 audio asking Langfitt

9  to "stop it" and "stop scaring people," and telling him he was scaring and "hurting people

10  that you love." She also reported that Langfitt had pushed her to the ground trying to get

11  away from her. He was running at and banging on cars, screaming, trying to jump into

12  passing cars. *See* Dkt. 63, Ex. A.

13    Deputy Edwards responded to the 911 call in his fully marked, 2015 Chevrolet

14  Tahoe patrol vehicle. Dkt. 67 at 7. When Edwards arrived, he pulled over, and Langfitt

15  immediately sprinted at him— "like a cheetah" in Powers' contemporaneous telling, Dkt.

16  66 at 14—holding what turned out to be folded paper, but which Edwards thought was a

17  weapon. *Id.* at 17–18. Edwards believed that Langfitt was attacking him, exited his

18  cruiser, and drew his weapon. *Id.* at 17, 26. He ran backwards, and he claims he yelled at

19  Langfitt to "get back or get down or both, multiple times." *Id.* at 17, 27, 30. He thought

20  Langfitt was going to stab him with whatever he had in his hand. *Id.* at 25.

21    A bystander, Gary Taylor, who was stopped behind Edwards' cruiser, also saw

22  something in Langfitt's hand, which he thought was a knife or a gun. He was "amazed"

that Edwards didn't shoot when Langfitt was running at him. *See* Dkt. 69, Exs. K and L. Another bystander, Kyle Black reported the same: Langfitt was running at Edwards in a "hostile" manner. Dkt. 70 at 9.

Just after Edwards gave this command, it is apparently undisputed that Langfitt made a sudden, sharp turn away from Edwards and toward his running, open cruiser a few feet away. Edwards claims Langfitt dove into the open driver's door, with his upper body overshooting the driver's seat and going over the center console. Dkt. 67 at 18. He asserts that Langfitt was in the cruiser, though not yet fully seated in a position to close the door and drive away. *Id.*

Edwards knew that his cruiser had an AR-15 rifle secured[3] in a rack, and a knife near the driver's seat. *Id.* at 18, 22. He contends that he was afraid that if Langfitt was able to get in the car and drive off, he was going to hurt someone, either with the car or with the weapons in it. *Id.* at 18. When Langfitt reached out his arm to close the driver's door, Edwards began shooting. *Id.* at 18, 26. Powers similarly reported to the 911 dispatcher that Langfitt "literally dove into the driver's seat of the car," and that is when the officer shot him. Dkt. 63 at 16.

Edwards claims that he believed Langfitt was a threat to Edwards' safety and to the safety of others, and he shot him to prevent him from hurting someone else. He was afraid that, with all the people that were there, "it would've been inevitable if he would've driven I have no doubt he would've hit someone." Dkt. 67 at 34; *see also* Dkt.

---

[3] The rifle could be released with the push of a button. Defendants also assert that the rifle could be used while it was still in the rack. Dkt. 78 at 9 (citing Dkt. 79 at 8).

65, Ex. T (Deposition of Colby Edwards) at 57:17–23. Edwards also reported that he was "worried about the gal in the SUV" (Powers), because he "thought she would be injured 'cause it looked like he was tryin' to yard, or to get into her car to steal her car." Dkt. 67 at 29. Edwards claimed that night, and today, that he yelled "get back or get down," or both, multiple times. *Id.* at 17–18. Powers now claims she did not hear[4] any warnings "over the PA or anything like that," Dkt. 75 at 2, but she reported at the time she was "sure" the officer "said something." Dkt. 66 at 14.

Edwards fired five or six shots at Langfitt. Langfitt died at the scene. It was only a matter of seconds between Langfitt running at Edwards and Edwards shooting him. *See* Dkt. 70 at 8. Photographs of the scene show Langfitt's body largely in the driver's seat of Edwards' cruiser, with his feet hanging out of the open door, but not on the ground. *See* Dkts. 76-4, 76-13, and 76-16; *see also* Dkt. 63 at 17 ("But he's sitting in the front seat of the sheriff's vehicle, basically, the driver's seat."); Dkt. 66 at 12 ("And he literally lunged in the car.").

Langfitt's estate sued Edwards and the County, alleging § 1983 Fourth Amendment and *Monell* claims. Defendants twice sought dismissal on the plausibility of Langfitt's claims, and both were denied on the core § 1983 claims. They now seek summary judgment on the full factual record, arguing there is no evidence supporting Langfitt's claims, and that Edwards is entitled to qualified immunity in any event. Dkt.

---

[4] The Court notes that the sound of shots cannot be heard on the audio of Powers' 911 call.

59. Langfitt argues that there are questions of fact regarding Edwards' use of force (and his training) precluding summary judgment. Dkt. 74.

## II.   DISCUSSION.

**A.      Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty Lobby, Inc*., 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

1    **B.      Langfitt's § 1983 Fourth Amendment claim.**

2         Langfitt's primary claim is a 42 U.S.C. § 1983 claim against Edwards for using

3    excessive force and violating Langfitt's Fourth Amendment constitutional rights. The

4    parties agree that Edwards acted under color of state law when he shot and killed

5    Langfitt.

6         An excessive force claim is examined under the Fourth Amendment's prohibition

7    against unreasonable searches and seizures. *Graham v. Connor*, 490 U.S. 386, 396–97

8    (1989). The officer's actions are measured by the standard of objective reasonableness.

9    *Id*. The Court considers the totality of the circumstances, including the three *Graham*

10   factors in assessing the reasonableness of the force used: (1) "the severity of the crime at

11   issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or

12   others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by

13   flight." *Smith v. City of Hemet*, 394 F.3d at 701 (9th Cir. 2005) (citing *Graham*, 490 U.S.

14   at 396). Whether the suspect poses a threat to the safety of officers or others is "the most

15   important single element of the three specified factors." *Chew v. Gates*, 27 F.3d 1432,

16   1441 (9th Cir. 1994); *see also Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

17        Edwards contends that, against this standard, he did not violate Langfitt's

18   constitutional rights: he claims he reasonably and probably correctly believed that

19   Langfitt posed an immediate threat to the safety of others. Edwards argues that, even if he

20   did violate Langfitt's constitutional rights, he is entitled to qualified immunity because it

21   was not clearly established that his conduct in the particular circumstances he faced was

22   constitutionally prohibited.

1    Under the qualified immunity doctrine, "government officials performing

2   discretionary functions generally are shielded from liability for civil damages insofar as

3   their conduct does not violate clearly established statutory or constitutional rights of

4   which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

5   (1982). The purpose of the doctrine is to "protect officers from the sometimes hazy

6   border between excessive and acceptable force." *Brosseau v. Haugen*, 543 U.S. 194, 198

7   (2004) (parenthetically quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

8    A two-part test resolves claims of qualified immunity by determining whether

9   plaintiffs have alleged facts that "make out a violation of a constitutional right," and if so,

10   "whether the right at issue was clearly established at the time of defendant's alleged

11   misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotation marks

12   omitted).

13    Qualified immunity protects officials "who act in ways they reasonably believe to

14   be lawful." *Garcia v. Cnty. of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011) (quoting

15   *Anderson v. Creighton*, 483 U.S. 640, 641 (1987)). Although it is fact-specific, the

16   reasonableness inquiry is objective, evaluating "whether the officers' actions are

17   'objectively reasonable' in light of the facts and circumstances confronting them, without

18   regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Even if the

19   officer's decision is constitutionally deficient, qualified immunity shields him from suit if

20   his misapprehension about the law applicable to the circumstances was objectively

21   reasonable. *See Brosseau*, 543 U.S. at 198.

22

1    Furthermore, qualified immunity protects officers not just from liability, but from

2    suit: "it is effectively lost if a case is erroneously permitted to go to trial," *Liberal v.*

3    *Estrada*, 632 F.3d 1064 (9th Cir. 2011), and thus, the claim should be resolved "at the

4    earliest possible stage in litigation," *Creighton*, 483 U.S. at 646 n.6. The purpose of

5    qualified immunity is "to recognize that holding officials liable for reasonable mistakes

6    might unnecessarily paralyze their ability to make difficult decisions in challenging

7    situations, thus disrupting the effective performance of their public duties." *Mueller v.*

8    *Auker*, 576 F.3d 979, 993 (9th Cir. 2009). Because it is inevitable that law enforcement

9    officials will in some cases reasonably but mistakenly conclude that probable cause is

10   present, an officer is entitled to qualified immunity when their conduct is objectively

11   reasonable. *See Garcia*, 639 F.3d at 1208; *Creighton*, 483 U.S. at 639. Qualified

12   immunity "gives ample room for mistaken judgments" and protects "all but the plainly

13   incompetent." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation marks

14   omitted).

15   The Court must measure reasonableness "from the perspective of a reasonable

16   officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at

17   396. Courts are cautioned to make "allowance for the fact that police officers are often

18   forced to make split-second judgments—in circumstances that are tense, uncertain, and

19   rapidly evolving—about the amount of force that is necessary in a particular situation."

20   *Id*. at 396–97.

21   Since *Pearson*, district courts have had discretion to address the two prongs of the

22   *Saucier* qualified immunity inquiry in either order. *Pearson*, 555 U.S. at 236. In some

cases, it is plain that a right is not clearly established but far from obvious whether in fact there is such a right. *Id.* at 237. In such a case, analyzing first whether there is a constitutional violation at all is an inefficient use of judicial resources, and requiring courts to do so invites them to address constitutional issues they need not address to determine that the law is not clearly established. *Id.* at 241. In other cases—like this one—a discussion of "why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all." *Id.* at 236. The Court's discussion of Langfitt's excessive force claim will address both questions.

For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question *beyond debate.*" *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) (emphasis added). There must exist "controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (internal quotation marks omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Although it is not necessary that "the very action in question has previously been held unlawful," *Creighton*, 483 U.S. at 640, "there must be some parallel or comparable factual pattern to alert an officer that a series of actions would violate an existing constitutional right," *Fogel v. Collins*, 531 F.3d 824, 833 (9th Cir. 2008). Courts are "not to define clearly established law at a high level of generality." *al–Kidd*, 563 U.S.

1   at 742. Police officers are entitled to qualified immunity unless existing precedent

2   "squarely governs" the specific facts at issue. *Mullinex v. Luna*, 577 U.S. 7, 13 (2015).

3     Excessive force cases often involve factual issues that must be resolved before the

4   court can determine whether there was a constitutional violation, or whether the case law

5   prohibiting the given use of force in the circumstances the officer faced was clearly

6   established.

7     Edwards' summary judgment motion argues that there is no evidence supporting

8   Langfitt's claim that the force he used in the circumstances he faced was unconstitutional.

9   He emphasizes that under *Graham*, his use of force was objectively reasonable because it

10  was reasonable for him to believe, and he subjectively believed, that Langfitt was a

11  danger to Edwards and to the public at large. He argues that the "crimes" of which

12  Langfitt was suspected include attempted carjacking of passing cars, and possibly

13  domestic violence on Powers, whose car he was hitting. Edwards points out that Powers

14  had reported that Langfitt pushed her down, and that Langfitt was trying to get into

15  moving vehicles. When Edwards arrived, Langfitt ran at him aggressively with

16  something, possibly a weapon, in his hand—the scene was dark, except for headlights

17  and flashing lights—and he then suddenly moved to enter and presumably drive off in the

18  nearby running, armed cruiser.

19    Edwards argues that once Langfitt leapt into his car, he was afraid that he would

20  endanger others, by driving while in his "paranoid" and erratic state, and perhaps by

21  accessing the rifle or the knife that were in the cruiser. Even if he could not access the

22  weapons immediately, he could have done so later, if he fled in the cruiser. He asserts he

1    did not have time to use alternate methods to detain Langfitt, and, essentially, that he had

2    no choice but to use his weapon to stop Langfitt. Dkt. 59.

3         Langfitt responds that there are other relevant factors in the totality of the

4    circumstances, including the availability of less intrusive force (such as a taser or pepper

5    spray), and the fact that Edwards knew Langfitt was mentally disturbed, or having some

6    sort of emotional breakdown—that was impetus for and the primary import of Powers'

7    911 call. He also argues, correctly, that where the only other witness[5] is dead and unable

8    to testify, an officer's telling of the events must be carefully evaluated against other

9    evidence, including "medical reports, contemporaneous statements by the officer and the

10   available physical evidence . . . to determine whether the officer's story is internally

11   inconsistent with other known facts." Dkt. 74 at 13 (citing *Gonzalez v. City of Anaheim*,

12   747 F.3d 789, 795 (9th Cir. 2014)).

13        In support of his latter argument, Langfitt contends that there remain numerous

14   factual disputes. Langfitt's list includes whether Langfitt had used alcohol or marijuana,

15   whether he had committed a crime, and whether Langfitt could have in fact accessed the

16   cruiser's secured rifle. Dkt. 74 at 9–10. Langfitt also contends that the facts upon which

17   Edwards' motion and defense rely remain at issue. Plaintiff contends that Langfitt did not

18   have anything in his hands, that Edwards did not give any express warning before he

19   shot, and that Langfitt was "never" in Edwards' cruiser. *Id.* Specifically, Powers asserts

20   that she "did not hear" Edwards "give any commands over the PA or anything like that to

21   _____

22   [5] Here, the other eyewitnesses (including Powers, at the time) supported Edwards'
account, and none contradicted it.

1  Billy prior to shooting him." Dkt. 75 at 2. Powers now asserts that Langfitt "was never in

2  Deputy Edwards vehicle, and he did not jump into Edwards' vehicle. Billy was not

3  situated in Deputy Edwards vehicle." *Id*. Instead, she claims, Langfitt "fell" into the

4  vehicle after he was shot. *Id*.

5      As to the latter point, photographs from the scene demonstrate that Langfitt was at

6  least mostly in Edwards' cruiser after he died. He could not have closed the door, because

7  his feet were in the way, but his feet were not on the ground. Langfitt's buttocks were

8  mostly in the driver's seat. Dkt. 76-4; *see also* Dkt. 72-2. Powers' current testimony is

9  contrary to her contemporaneous report that Langfitt *did* dive into the cruiser, and to the

10  photographic and physical evidence. The assertion that Billy "fell" into the driver's seat

11  after he was shot does not make sense; he would have had to have "fallen" up and onto

12  the driver's seat. Furthermore, Langfitt's wounds were on the left, or outward side of

13  body as he sat in the driver's seat. This is consistent with Edwards' account, that he

14  "dove" into the cruiser and was turning to sit in a driving position when he was shot. Dkt.

15  76-4. It is also consistent with Powers' contemporaneous description of the events that

16  night, Dkt. 66 at 12–13, and it is inconsistent with Powers' current assertion that Edwards

17  shot while Langfitt was running toward the car, but before he got in, Dkt. 75. No

18  reasonable jury could find that Langfitt was shot outside the cruiser.

19      Powers' claim that she did not hear Edwards shout commands to Langfitt "over

20  the PA [public address, or loudspeaker]" is not evidence contradicting Edwards' claim

21  that he did shout commands to Langfitt while he, Edwards, was outside his cruiser, where

22  the PA was located. At the time, Powers conceded that, though her windows were rolled

1  up (per the 911 dispatcher's direction), she heard "shouting" before shots were fired. Dkt.

2  79 at 4. Her account is not inconsistent with Edwards claim that he repeatedly

3  commanded Langfitt to stop or get down.

4       Finally, Powers reported at the time that Langfitt did have something in his hands.

5  Taylor, the bystander witness, reported the same, and he thought it could have been a

6  knife or a gun. The object turned out to be white pieces of paper, and they ended up

7  inside the cruiser, on the driver's side floor. Dkt. 76-4; *see also* Dkt. 64 at 6. One of the

8  papers referenced an inheritance Langfitt had received from his grandfather, about whom

9  Langfitt was indisputably "screaming" well before Edwards arrived. Dkt. 76-2. As

10  Defendants argue, testimony should be disregarded when it contradicts the witnesses'

11  recorded statements, other witness testimony and the physical evidence. Dkt. 78 at 4

12  (citing *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 779 (2020) (where

13  plaintiffs' denials are "'blatantly contradicted by the record,' 'a court should not adopt

14  that version of the facts for purposes of ruling on a motion for summary judgment'")). A

15  reasonable jury could not find that Langfitt did not have something in his hand when he

16  charged at Edwards, or when he entered the cruiser.

17       The Court is not persuaded that there are material questions of fact about the

18  context of Edwards' use of deadly force, even viewing the evidence and drawing all

19  inferences in the light most favorable to the non-moving plaintiff. That is not, however,

20  the end of the inquiry; the Court must still address whether, under these facts, Edwards

21  violated Langfitt's rights, and whether those rights were clearly established.

22

1     Edwards relies on authority holding that the use of force against an unarmed but

2     unstable person who got into and attempted to drive a police car on a public road was

3     "objectively reasonable." Dkt. 59 at 20–21 (citing *Long v. Slaton*, 508 F.3d 576, 580–81

4     (11th Cir. 2007); *Mullenix*, 577 U.S. at 17 (discussing *Long*)). He argues that Courts have

5     consistently held that an officer faced with such circumstances need not take the chance

6     that an unstable individual attempting to steal a police car would not use it to harm

7     others, and simply "hope[] for the best." *Id.* at 21 (citing *Mullenix*, 577 U.S. at 17).

8     Langfitt emphasizes that one of the factors to consider in evaluating the use of

9     force is the availability of less lethal means to stop the suspect. Dkt. 74 at 12 (citing

10    *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001). He concedes that officers

11    are not required to use the least intrusive force, but they are required to act within the

12    range of reasonable alternatives. Dkt. 74 at 12 (citing *Scott v. Henrich*, 39 F.3d 912, 915

13    (9th Cir. 1994)). Here, Edwards was concerned not just that Langfitt—who minutes

14    before was attempting to carjack other vehicles—would flee in his cruiser, but that he

15    would then have access to the AR-15 and the knife in it.

16    Langfitt relies primarily on *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079–80 (9th

17    Cir. 2014), for the proposition that the reasonableness of the use of force is a jury

18    question. But *Cruz* did not involve analogous facts. The decedent there (a drug dealer

19    who had asserted he was "not going back to prison") was in his own vehicle, attempting

20    to escape police officers. When the officers surrounded him, he got out of his car and the

21    officers ordered him to get down. The officers claimed that Cruz reached for his

22    waistband, presumably for the weapon he was reported to have with him, and they shot

1   him. The Ninth Circuit held that there was enough circumstantial evidence to "give a

2   reasonable jury pause" about the officer's account: primarily, Cruz did *not* have a weapon

3   in his waistband; it was later found on the passenger seat, with the safety on. It did not

4   make sense that Cruz would reach for a weapon he presumably knew he did not have,

5   casting doubt on the officers' account. There was thus a question of fact about whether a

6   reasonable jury could find it more likely than not that Cruz did *not* reach for his

7   waistband. *Cruz*, 765 F.3d at 1079.

8      The facts there are not akin to those in the record here. Langfitt did have

9   something in his hand, and both Edwards and at least one bystander thought it was a

10  weapon. Langfitt was acting irrationally, running to get into a running, marked, armed

11  cruiser. As discussed above, there are no material questions of fact about the

12  circumstances Edwards faced. The circumstantial and physical evidence, as well as

13  Powers' and others' contemporaneous accounts, all support Edwards' version of the

14  events.

15     Langfitt also relies on *Deorle*, which involved an erratic man armed with a

16  hatchet, a plastic cross bow, and possibly a can of lighter fluid. Deorle was shouting at

17  the officers but was compliant with their commands, and dropped his weapons when

18  ordered to do so. As he walked toward the officers, and without ordering Doerle to stop,

19  and without warning him that he would be shot if he did not stop, an officer shot him in

20  the face with a "less lethal" bean bag round, fracturing his skull and causing him to lose

21  an eye. The Ninth Circuit held that the officer was not entitled to qualified immunity:

22

> Every police officer should know that it is objectively unreasonable to
> shoot . . . an unarmed man who: has committed no serious offense, is
> mentally or emotionally disturbed, has been given no warning of the
> imminent use of such a significant degree of force, poses no risk of flight,
> and presents no objectively reasonable threat to the safety of the officer or
> other individuals.

*Deorle*, 272 F.3d at 1285.

*Deorle* is not analogous to the situation Edwards faced, either. Langfitt was not compliant; the only evidence in the record is that he was commanded to stop or get down, or both, and he did neither. Langfitt *was* suspected of a crime, and he *was* a risk to flee in an armed cruiser. Most importantly, Edwards knew that Langfitt had already been trying to enter other vehicles travelling along Mountain Highway; Powers and another witness reported that to 911. Edwards' belief that Langfitt was attempting to steal a marked, armed cruiser and to flee, putting the safety of others squarely and plainly at risk, was objectively reasonable.

It is true that while Edwards claims he commanded Langfitt to stop, he does not claim he warned Langfitt he would be shot if he did not do so. The Court agrees that whether a specific warning was given or was feasible in the moment is another factor in the totality of the circumstances surrounding the officer's decision to use deadly force. The *Doerle* court included the lack of a warning (or a command to stop) in its list of factors supporting the conclusion that the officer's use of force there was objectively unreasonable. But *Doerle* is not authority for the proposition that a specific warning about the consequences of the failure to obey a command to stop is a necessary prerequisite to the use of deadly force, or to granting summary judgment on qualified

immunity. Langfitt has not identified any authority putting such a requirement "beyond debate" and the Court is aware of none. *Doerle* is not precedent for the proposition that Edwards' conduct in the circumstances he faced was objectively unreasonable under clearly established law.

Finally, Langfitt's efforts to distinguish *Long* as "fundamentally different" from this case are not persuasive. Dkt. 74 at 22. He concedes that *Long* involved an unstable man who had taken control of a police car and was fleeing in it, and that the officer's use of force in that circumstance was held to be objectively reasonable. The only difference is that the plaintiff there had fully succeeded in doing what an objective observer would conclude that Langfitt was attempting to do when he was shot: steal an armed cruiser while in a highly agitated, emotionally unstable, irrational state.

Langfitt has not pointed the Court to any opinion "squarely governing" the situation, clearly establishing the conclusion that Edwards' use of deadly force in the totality of the circumstances he faced was objectively unreasonable. Indeed, there is not authority even suggesting that Edwards' conduct was unconstitutional.

As Edwards argues, it is in fact clear under these and other authorities that Edwards' use of force *was* objectively reasonable. Edwards did not violate Langfitt's Fourth Amendment constitutional rights as a matter of law, and even if he did, he is entitled to qualified immunity.

Edwards' Motion for Summary Judgment on Langfitt's § 1983 excessive force claim against him is therefore GRANTED, and that claim is DISMISSED with prejudice.

**C.**   ***Monell* failure to train claim.**

Langfitt also asserts a failure to train *Monell* claim against the County. He alleges that the County failed to properly train its deputies, including Edwards, on interacting with mentally disturbed individuals like him, on the use of force when a vehicle is involved, and on the use of less intrusive force.

To set forth a claim against a municipality under 42 U.S.C. § 1983, a plaintiff must show that the defendant's employees or agents acted through an official custom, pattern, or policy that permits deliberate indifference to, or violates, the plaintiff's civil rights; or that the entity ratified the unlawful conduct. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *Larez v. City of Los Angeles*, 946 F.2d 630, 646–47 (9th Cir. 1991). Under *Monell*, a plaintiff must allege (1) that a municipal employee violated a constitutional right; (2) that the municipality has customs or policies that amount to deliberate indifference; and (3) that those customs or policies were the "moving force" behind the constitutional violation. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). A municipality is not liable simply because it employs a tortfeasor. *Monell*, 436 U.S. at 691.

A municipality may be liable for inadequate police training when "such inadequate training can justifiably be said to represent municipal policy" and the resulting harm is a "highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006).

1    As the County emphasizes, "a municipality's culpability for a deprivation of rights

2    is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*,

3    563 U.S. 51, 61 (2011). To show the inadequacy of training, a plaintiff must show that

4    the County's failure to train "amounts to deliberate indifference to the rights of persons

5    with whom the [untrained employees] come into contact." *City of Canton v. Harris*, 489

6    U.S. 378, 388 (1989).

7        The County argues that there is no evidence supporting Langfitt's claim that

8    Edwards was improperly trained on mental illness or deadly force, or that any inadequacy

9    was the moving force behind a constitutional deprivation. Dkt. 59 at 15.

10       Langfitt asserts that Pierce County deputies were "taught and believed that they

11   were allowed to shoot at individuals provided they were in a vehicle," and that there was

12   "confusion as to whether deputies could shoot at individuals in vehicle." Dkt. 74 at 25.

13   Langfitt does not support these assertions, but the County perceives that he is referencing

14   a 2016 "training slide" that was presented a single time by its use of force instructor,

15   Glen Carpenter. Dkt. 76-17. The County argues that there is no evidence that Edwards

16   ever saw the slide, and provided evidence that he did not. Carpenter issued clarifying

17   training (including the then-recent *Mullenix* Supreme Court opinion) in September 2017,

18   well before Edwards shot Langfitt. Dkt. 76-17 at 4. And, in any event, as the County

19   points out, there is no evidence supporting the conclusion that any inadequate training

20   was the moving force behind a constitutional deprivation in this case. Dkt. 78 at 5. No

21   such deprivation occurred, as a matter of law.

22

1    Langfitt has not met his summary judgment burden of providing evidence from

2    which a reasonable jury could find that Edwards was inadequately trained on dealing

3    with mentally ill persons he was likely to contact, or that he was inadequately trained in

4    the use of force. There is no evidence that the incident in question was caused by

5    inadequate training. The County's Motion for Summary Judgment on Langfitt's *Monell*

6    failure to train claim is GRANTED, and that claim is DISMISSED with prejudice.

7                                                          ***

8    This case involves a tragic incident that resulted in the loss of William V. Langfitt

9    IV's life, leaving family and friends grieving. The events will also be a lasting and

10   painful memory for both Naomi Powers and Deputy Edwards.

11   Defendant Edwards' Motion for Summary Judgment is **GRANTED**, and

12   Plaintiffs' § 1983 excessive force claim against him is **DISMISSED with prejudice**. The

13   County's Motion for Summary Judgment on Langfitt's *Monell* claim is **GRANTED**, and

14   that claim is **DISMISSED with prejudice**. Langfitt's pending motion for an extension of

15   the discovery deadline, Dkt. 81, is **DENIED as moot**. The trial date and all pretrial

16   deadlines are **VACATED**.  The Clerk shall enter a judgment and close the case.

17   IT IS SO ORDERED.

18   Dated this 7th day of February, 2023.

19

20

21                                        BENJAMIN H. SETTLE
                                          United States District Judge

22